**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| TINA K. WESTLAKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-CV-152-GKF-TLW |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the court are the Report and Recommendation of United States Magistrate Judge T. Lane Wilson on the judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits [Dkt. #29] and the Commissioner's Objection to the Report and Recommendation. [Dkt. #30].

Plaintiff Tina K. Westlake ("Westlake") asserts the Commissioner's decision should be reversed and remanded because the ALJ:

1. ignored the opinions of two of her treating physicians, who imposed postural and exertional restrictions on her ability to work;

2. failed to properly analyze a third party function report completed by her boyfriend;

3. in determining her residual functional capacity, failed to include limits on overhead reaching, failed to impose a sit/stand option and failed to incorporate mental limitations found at step two into her findings at step four; and

4. did not perform a proper credibility assessment.

The Magistrate Judge recommended the decision be reversed and remanded based on the first ground asserted by Westlake.[1]

## I. Procedural History

Westlake filed her application for disability insurance benefits and supplemental security income benefits on November 17, 2009, with a protective filing date of October 29, 2009. [R. 111-115, 123-125]. She alleged a disability onset date of September 7, 2007. [R. 111]. Westlake alleged she was unable to work due to a variety of problems, including back, neck and knee injuries, anxiety and panic attacks. [R. 127]. Her claim for benefits was denied initially on May 11, 2010, and on reconsideration on August 30, 2010. [R. 56-61, 66-68]. Westlake requested a hearing before the Administrative Law Judge ("ALJ"), and the ALJ conducted a hearing on August 23, 2011. [R. 24-55, 69-70]. Westlake was represented by counsel at the hearing. [R. 14]. The ALJ issued her decision on November 23, 2011, denying benefits and finding Westland not disabled because she was able to perform other work. [R. 11-23]. The Appeals Council denied review, and Westlake appealed. [R. 1-5].

## II. Standard of Review

Pursuant to Fed. R. Civ. P. 72(b)(3), "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. However, even under a de novo review of such portions of the Report and Recommendation, this court's review of the Commissioner's decision is limited to a determination of "whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* It

---

[1] The Magistrate Judge did not address the remaining three grounds, but recommended that if the court finds remand on the first issue is not required, the matter be recommitted to the Magistrate Judge for an additional report and recommendation on the remaining issues. [Dkt. #29 at 8].

is more than a scintilla, but less than a preponderance. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). The court will "neither reweigh the evidence nor substitute [its] judgment for that of the agency." *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disability" is defined under the Social Security Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of her alleged disability. 20 C.F.R. §§ 404.1512(c), 416.912(c). "A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; *Williams v. Bowen,* 844 F.2d 748, 750-51 (10th Cir. 1988) (setting forth the five steps in detail). The claimant bears the burden of proof at steps one through four. *Williams*, 844 F.2d at 751 n.2. At step one, a determination is made as

to whether the claimant is presently engaged in substantial gainful activity. *Id.* at 750. At step two, a determination is made whether the claimant has a medically determinable severe impairment or combination of impairments that significantly limit her ability to do basic work activities. *Id.* at 750-51. At step three a determination is made whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. *Id.* at 751. If it is, the claimant is entitled to benefits. *Id.* If it is not, the evaluation proceeds to the fourth step, where the claimant must show that the impairment prevents her from performing work she has performed in the past. *Id.* If the claimant is able to perform her previous work, she is not disabled. *Id.* If she is not able to perform her previous work, then the claimant has met her burden of proof, establishing a prima facie case of disability. The evaluation process then proceeds to the fifth and final step: determining whether the claimant has the residual functional capacity ("RFC")[2] to perform other work in the national economy in view of her age, education, and work experience. *Id.* The Commissioner bears the burden at step five, and the claimant is entitled to benefits if the Commissioner cannot establish that the claimant retains the capacity "to perform an alternative work activity and that this specific type of job exists in the national economy." *Id.*

### III. The ALJ's Decision

At Step One, the ALJ found that Westlake had not engaged in any substantial gainful activity since her application date of October 24, 2009. [R. 16]. At Step Two, the ALJ found Westlake had severe impairments of fibromyalgia, degenerative disc disease, status post cervical spine fusion, history of left knee surgery, plantar fasciitis, obesity and generalized anxiety disorder. [*Id.*]. At Step Three, she found that Westlake did not have an impairment or

---

[2] A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability. *Williams,* 844 F.2d at 751.

4

combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. [R. 16-18]. The ALJ found that Westlake had moderate restriction in activities of daily living; social functioning; and concentration, persistence or pace. [R. 17]. She found the severity of Westlake's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of a listing. [R. 16-17].

The ALJ reviewed the testimony of Westlake and her boyfriend. [R. 19]. Westlake testified she is unable to work because of mood swings, inability to sit or stand for long periods, and pain which is five out of ten on an average day and sometimes an eight or nine out of ten. [*Id.*]. She reported she has pain in her lower back, neck, left foot and left knee. She can stand for 20-30 minutes and maybe two hours in an eight-hour day; sit for one hour at a time and a total of three hours in an eight-hour day; and walk half a block and lift three pounds. [*Id.*]. Her ability to lift a gallon of milk depends on the day. [*Id.*] She can feed and dress herself most days, but twice a month she is unable to put her shoes on. [*Id.*]. Her friend or her brother does most of the household chores. [*Id.*]. She goes somewhere every week to two weeks and is able to go to the casino. She goes to church on occasion. [*Id.*].

Westlake's boyfriend, Frank Culp, provided a Function Report – Adult (Third Party) dated December 23, 2009. [*Id.*] He reported that Westlake's only problem with personal care is that she is sometimes unable to brush her hair. [*Id.*]. He stated that she cooked daily and did laundry and dishes; went outside three times a week; and was able to drive a car. [*Id.*]. Additionally, he reported that she was able to shop once a week and did not have any problems with money except that she forgets to pay bills sometimes. [*Id.*]. He stated that people came to visit Westlake once or twice a week, and that they talk and watch movies. [*Id.*].

The ALJ also reviewed recent medical evidence including a July 20, 2009 doctor's visit to Morton Comprehensive Health Services; visits on April 28, 2010 and May 19, 2010 to Neighbor for Neighbor; a June 23, 2010 assessment by Associated Center for Therapy; and x-rays taken on July 8, 2010. [R. 20].

The ALJ noted that, in the July 20, 2009 visit to Morton, Westlake had been advised to contact Family and Children's Services for further evaluation but had not done so. [*Id.*]. Additionally, her physical examination was normal except for claimant's elevated weight, and she denied any fevers, chills, vision changes, chest pain, palpitations, shortness of breath, abdominal pain, headache or dizziness. [*Id.*]. The ALJ stated, "It is reasonable to assume, that someone with debilitating impairments would seek out every avenue of help possible, yet by not making the appointment with Family and Children's Services as advised, it was indicated that the impairments may not be as severe as alleged." [*Id.*].

Regarding the Neighbor for Neighbor visits, the ALJ stated that on April 28, 2010, it was noted that Westlake's normal blood pressures had been in the one-hundred thirties over eighties, but on that day, her blood pressure was high and that her weight had never been that high. [*Id.*]. She had chest wall tenderness and normal cardiovascular sounds; there were no limitations given with regard to either her elevated blood pressure or the chest wall pain. [*Id.*]. On May 19, 2010, her blood pressure was back to one-hundred twenty-two over seventy-four. [*Id.*].

In the June 23, 2010 assessment by the Associated Center for Therapy, it was noted that Westlake "had *some* ongoing mood swings, daily anxiety and *moderate* depression and "[h]er affect was *somewhat* flat but she engaged with minimal encouragement." [*Id.*] (emphasis in original). Westlake appeared to be alert and oriented with adequate hygiene. It was noted that Westlake was not compliant with the treatment plan; she had kept only four out of seven therapy

6

appointments. Further, it was reported the claimant had worked towards acceptance of her physical changes and felt that her medication management was working well for her. The ALJ stated, "The findings in this assessment are not indicative of disabling impairments." [*Id.*].

The ALJ observed that the July 8, 2010 x-rays of claimant's knee showed no fracture or other abnormalities, and stated, "The findings in this record do not support the credibility of the allegation of disabling knee pain. [*Id.*].

The ALJ also observed that on November 15, 2010, Westlake asked to be discharged from Associated Centers for Therapy so that she could participate in a research program for chronic pain. [*Id.*]. At that time, it was reported that Westlake could manage her activities of daily living with minimal assistance, she had excellent symptom control with her medication regimen and that she enjoyed water aerobics. [*Id.*]. The ALJ stated, "The information contained in this discharge record indicated that the alleged mental impairment was not as severe as alleged, if the claimant was able to manage her daily activities with minimal assistance and she experienced excellent symptom control with medication." [*Id.*].

Citing medical records from OSU Physicians – Family Medicine, the ALJ stated that despite Westlake's allegations of debilitating pain, on July 25, 2011, it was noted she stands when at the casino and was doing multiple exercises including door pushes, picking up towel, frozen bottle/can exercises, tip toe exercises and continuing pool exercises. [*Id.*]. And she stated, "The notes in this record do not support allegations of disabling pain, standing at a casino and doing the aforementioned exercises is not commensurate with the pain as alleged." [R. 21].

The ALJ acknowledged that the State Disability Determination Services rated the claimant at light exertion, but stated, "I give that opinion little weight because it did not take into account the combination of the claimant's back, neck, knee, feet and obesity, which are more

likely to limit her standing and walking to no more than two hours." [*Id.*]. She also noted that Westlake's attorney had asked for additional time after the hearing to submit a medical source statement from Dr. Hannan, but the attorney failed to submit the report; therefore, the ALJ made "a negative inference that the opinion was either not favorable to the claimant or Dr. Hannan refused to complete the report, even though he does so in many cases, because he could not provide a favorable opinion in this case." [*Id.*].

The ALJ found that Westlake's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, her statements concerning the intensity, persistence and limiting effect of these symptoms were not credible to the extent they were inconsistent with the RFC assessment. [R. 19]. She found that Westlake's "allegations of extreme pain and functional loss in her testimony appear to be an overstatement, given the factors above" and "[t]hese inconsistencies do not reflect positively on her overall credibility." [R. 21].

Based on these findings, the ALJ determined that Westlake had the residual functional capacity ("RFC") to perform a wide range of sedentary work with the following restrictions: occasionally lift and/or carry 10 pounds and frequently lift and/or carry up to ten pounds; stand and/or walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday; push and/or pull ten pounds occasionally and up to ten pounds frequently; frequently balance and occasionally climb, stoop, kneel, crouch and crawl; maintain superficial work-related interaction with co-workers, supervisors and the public, no requirement "to make judgments or perform detailed tasks in interactions;" and conduct "simple routine and some complex tasks but not more detailed tasks." [R. 18].

At Step Four, the ALJ determined that Westlake was unable to perform any past relevant work, as all past relevant work exceeded her RFC. [R. 21].

At Step Five, the ALJ found, based on the testimony of the vocational expert, there were a significant number of jobs in the national economy that Westlake could perform, including circuit board assembler and food and beverage order clerk. [R. 21-22]. Therefore, the ALJ found that Westlake was not disabled at any time from October 24, 2009, through the date of her decision. [R. 23].

## IV. Medical Evidence

The court concurs with the Magistrate Judge's finding that the ALJ's decision fairly summarizes Westlake's post-application medical records. However, the ALJ's decision does not address any of the medical records that pre-date plaintiff's November 2009 application. Those records establish that Westlake received extensive treatment for on-the-job injuries she sustained on August 23, 2007, when she fell down a flight of granite stairs, suffering a concussion and injuring her neck, back and left elbow. [R. 216].

Dr. Eugene G. Feild, a board-certified orthopedic surgeon, evaluated Westlake's head, neck, back and left elbow on December 12, 2007. [R. 272]. On April 28, 2008, Dr. Feild performed a diskectomy and fusion of Westlake's C5-6 and C6-7. [R. 254-255]. On August 20, 2008, he released her to return to work with the permanent restriction that she perform no "prolonged overhead activities." [R. 247-248]. On October 9, 2008, Westlake returned to Dr. Feild's office complaining of severe sacroiliac pain. [R. 243-244]. The doctor injected her left sacroiliac area, reviewed stretching exercises with her for her back and commented, "It is important that she drop her weight down." [*Id.* 243].

Westlake again visited Dr. Feild on April 29, 2009, complaining of left elbow pain. [R. 239]. Clinical evaluation found no evidence of decreased range of motion to any direction from normal, and her tenderness was confined to the ulnar nerve of the left elbow at the elbow. [*Id.*]. Dr. Feild noted he had seen the patient two years ago and she had a similar finding, but he ordered a new EMG. [*Id.*]. The EMG showed no conduction delay nor irritative patterns within the ulnar nerve, and the doctor concluded the nerve was "sensitive but not being damaged," and surgery of the ulnar nerve was not indicated. [R. 237]. Westlake was not able to tolerate the recommended pain medication, Lyrica. Therefore, Dr. Feild concluded she was "maximally medically improved." [*Id.*].

Westlake began seeing Dr. Christopher Covington on October 21, 2008, for neck and lower back pain. [R. 216-220]. She reported only aching pain and occasional muscle spasms in her cervical spine, but complained of low back pain that had been progressive, particularly over the last couple of months "even though it has been on and off severe since her fall last year." [R. 219]. Dr. Covington concluded that Westlake had fairly advanced disk disease at L4-5 with a probable disk herniation in the midline at L4-5, and a degenerative disk at 5-1 without stenosis. [*Id.*]. The remaining portion of her spine appeared normal. [*Id.*]. Dr. Covington concluded no further treatment of the cervical spine was needed at the time, after the patient expressed a preference for conservative treatment of the lumbar pain with an epidural steroid injection initially. [*Id.*]. Westlake received two epidural steroid injections. [R. 214]. The first lasted a few days and the pain recurred; the second did not help at all. [*Id.*]. Because she still complained of "pretty significant low back pain and bilateral lower extremity paresthesias," as well as neck pain, Dr. Covington recommended aqua therapy three times a week for the next four to six weeks. [*Id.*]. The doctor stated that Westlake remained temporarily totally disabled. [*Id.*].

On January 13, 2009, Westlake returned to Dr. Covington's office. An MRI showed she had normal disks at L4 and above, but L4-5 and L5-S1 were collapsed, there was a disk rupture and she had significant stenosis. [R. 212]. She had only had four or five aqua therapy treatments because of the flu. [*Id.*]. Dr. Covington asked her to return after aqua therapy so they could "make a decision about either return to work or surgery." [*Id.*]. The doctor stated she would be a candidate for a two level posterior lumbar interbody fusion based on her current pathology and symptoms. [*Id.*].

On February 17, 2009, Dr. Covington reported that Westlake was in the middle of aqua therapy but was not sure if it was working and was looking into acupuncture as a means of treatment. [R. 210]. Since she started physical therapy, she had experienced a "pretty significant increase in her cervical spine pain that radiates into both shoulders." [*Id.*]. The doctor stated that Westlake's activities at home included general chores, occasional lifting of groceries, etc. and occasional cleaning, and she spent maybe two days a week just lying in bed because of the discomfort. [*Id.*]. Dr. Covington concluded, "Based on this, the patient's work restrictions would include a maximum of 10 pounds, alternating sitting and standing per the patient and all of the obvious restrictive motions of non-repetitive bending, stooping, crawling, kneeling, squatting, climbing, working overhead, etc." [*Id.*].

On April 14, 2009, Dr. Covington wrote a letter to the worker's compensation judge handling Westlake's case. [R. 206-207]. He reported that Westlake had returned to his office complaining of pain at the base of the cervical spine radiating up into her shoulders. [R. 206]. He advised that an MRI scan was essentially normal, but showed a slight bulge on the left at C7-T1 that was probably a spur. [*Id.*]. He also stated that while Westlake had a problem in her lumbar spine it did not appear to be significant or limiting enough to warrant any type of surgical

intervention. [*Id.*]. Dr. Covington stated that shortly after Westlake left his office, he was presented with a video filmed on March 24 and 25, 2009, which showed the patient "very active for two days in a row," and which was "quite a discrepancy from her previous statement to me that she would have several days in a week that she was unable to get out of bed." [*Id.*]. The video showed Westlake, on March 24, going to the Million Dollar Elm Casino on three separate occasions, going through the drive-throughs at a bank and a fast food establishment, and going to a facility called "Harvard Garden." [*Id.*]. Dr. Covington observed that Westlake walked at a normal pace with no problem, opened and closed doors with no problem and was able to use her left arm out the window at the drive-throughs. [*Id.*]. On March 25, she drove to Oklahoma City and spent the day at multiple businesses with another female and a small child. [*Id.*]. She walked normally and was observed laughing on more than one occasion. "She was then able to sit long enough to make the drive back to Sand Springs." [*Id.*]. Dr. Covington stated:

> This video confirms my opinion that while there is a problem in the lumbar spine, some of which is degenerative and pre-existing, that her symptoms are not severe enough to warrant surgical treatment. I will mention however, that the patient was previously given restrictions of no lifting over 10 pounds and no repetitive bending, twisting or stooping. Nothing that I observed in the video violated these restrictions. It is my opinion within a reasonable degree of medical certainty that he patient has reached maximum medical improvement from her injury and can be released from care with permanent restrictions. On a permanent basis I feel that she should not lift over 25 to 30 pounds, should not perform work overhead and should alternate sitting and standing.

[R. 207].

## V. Analysis

On appeal, Westlake asserted that the ALJ ignored the opinion of Dr. Covington that she "should not perform work overhead and should alternate sitting and standing per the patient" and the opinion of Dr. Feild that she should "avoid prolonged overhead activities." [R. 207, 247]. In response, the Commissioner argued (1) Westlake waived the issue by failing to raise the treating

physicians' prior restrictions during the ALJ hearing; and (2) even if the issue had not been waived, the ALJ's failure to address the restrictions in her decision was harmless because these opinions did not limit Westlake's abilities any further than the ALJ's RFC findings. [Dkt. #21 at 3-6].

Social Security regulations require the ALJ to develop a record of at least 12 months of medical history preceding the application date. 20 C.F.R. § 416.912(d). The record includes reports of Drs. Covington and Feild concerning Westlake's treatment for neck, back and arm injuries resulting from her on-the-job fall, and in that sense the record was developed.

However, the ALJ should *consider* all of the relevant medical evidence, including evidence that predates the disability period. *Lackey v. Barnhart*, 127 Fed. Appx. 455, 458-59 (10th Cir. 2005) (citing *Hamlin v. Barnhart*, 365 F.3d 1208, 1223 n.15 (10th Cir. 2004)). The records at issue cover a period *after* the alleged onset of the disability and clearly should have been considered. And while the ALJ, in her decision, need not discuss *every* piece of evidence in the record, she "must discuss uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The RFC formulated by the ALJ fails to include the permanent limitations identified by Drs. Covington and Feild; yet the ALJ included no discussion about why she chose to exclude them.

### A. Waiver

The Commissioner argues Westlake waived this argument by failing to direct the ALJ's attention to the evidence during the hearing. The Tenth Circuit has held that "[w]hen the claimant is represented by counsel at the administrative hearing, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that

13

the claimant's claims are adequately explored," and "[t]hus, in a counseled case, the ALJ may ordinarily require counsel to identify the issue or issues requiring further development." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997). Nonetheless, "unlike the typical judicial proceeding, a social security disability hearing is nonadverserial, with the ALJ responsible in every case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised," including issues related to the claimant's RFC. *Id.* at 1164 (citations omitted). "It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 111 (2000).

Furthermore, Social Security regulations impose no requirement of issue exhaustion, and neither the Supreme Court nor the Tenth Circuit has imposed such a requirement with respect to Social Security appeals. *Id* at 109-111; *Hawkins*, 113 F.3d at 1164.

Therefore, the court rejects the Commissioner's argument that Westlake has waived this argument.

### B. Harmless Error

The Commissioner argues that even if the ALJ erred in failing to discuss the medical records of Dr. Covington and Dr. Feild, the error was harmless. Citing 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(a), she asserts that most unskilled sedentary jobs (85%) are bench-type jobs that involve working in front of oneself and not reaching overhead, and "certainly not more than occasional overhead reaching." [Dkt. #21 at 4].

The fallacy of this argument is that the limitations in the ALJ's hypothetical to the vocational expert contained *no* restriction on *any* kind of reaching, and both of the jobs the expert identified require *frequent* reaching (existing from 1/3 to 2/3 of the time). *See* Dictionary of Occupational Titles, 726.684-110 (Touch-up Screener, Printed Circuit Board Assembly);

14

209.567-014 (Order Clerk, Food and Beverage). "Reaching" is defined in the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO") as "[e]xtending hand(s) and arm(s) in any direction." *See* SCO, Appx. C Physical Demands. And it is impossible to determine based on the job descriptions whether the jobs require overhead reaching or reaching in another direction.

Citing *Segovia v. Astrue*, 226 Fed. Appx. 801, 804 (10th Cir. 2007), the Commissioner contends the overhead reaching limitation does not conflict with the sedentary jobs plaintiff was found able to perform. In *Segovia*, the ALJ included the limitation of "only occasional overhead reaching" in his RFC. *Id.* at 802. The vocational expert identified two jobs—ticket-taker and cafeteria attendant—the ALJ found to be consistent with the RFC. *Id.* at 804. Both required "frequent" reaching. *Id.* The Tenth Circuit recognized that given the broad definition of "reaching," it was unclear what kind of reaching the jobs required, but noted that "even a job requiring frequent reaching does not necessarily require more than occasional *overhead* reaching." *Id.* It reasoned that the vocational expert "was aware of Ms. Segovia's limitations on overhead reaching, and he testified . . . that she could perform the jobs he identified." *Id.* And it stated, "To the extent that there is any implied or indirect conflict between the vocational expert's testimony and the *DOT* in this case, . . . the ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis for doing so." *Id.* (citing *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000)).

However, in this case—unlike *Segovia*—the ALJ failed to include a limitation on overhead reaching, or *any* type of reaching, in her RFC. The vocational expert had no reason to consider whether, or to what extent the jobs she identified required overhead reaching, and she

identified two sedentary jobs that require frequent lifting. As a result, the record does *not* reflect an adequate basis for the vocational expert's opinion.

In a similar vein, the Commissioner asserts the RFC accommodates the "alternating sitting and standing per the patient" limitation articulated by Dr. Feilds, because sedentary jobs require not more than two hours per day of standing. *See* SSR 83-10 ("Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday."). However, although the RFC stated claimant could perform a sedentary job in which she would be required to sit no more than six hours in an eight-hour day and stand no more than six hours in an eight-hour day, the RFC did not address Dr. Feild's limitation that claimant be permitted to sit or stand "per the patient," which this court interprets to mean "as needed." And the agency's definition of "sedentary" sheds no light on the issue. Accordingly, as with the "reaching" issue, the record does not reflect an adequate basis for the vocational expert's opinion.

Therefore, the court rejects the Commissioner's argument that the ALJ's failure to address limitations imposed by Dr. Covington and Dr. Feild was harmless error.

## VI. Conclusion

For the reasons set forth above, the court overrules the Commissioner's Objection to Magistrate Judge's Report and Recommendation. [Dkt. #30]. The Magistrate Judge's Report and Recommendation [Dkt. #29] is accepted and the decision of the Commissioner is reversed and remanded for further consideration as set forth in the Report and Recommendation.

ENTERED this 16th day of July, 2013.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT